SANDRA R. BROWN
Acting United States Attorney
LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division
DENNISE D. WILLETT
Assistant United States Attorney
Chief, Santa Ana Branch Office
MICHAEL ANTHONY BROWN (Cal. Bar. No. 243848)
GREGORY S. SCALLY (Cal. Bar No. 268073)
Assistant United States Attorney
Ronald Reagan Federal Bldg & U.S. Courthouse
411 West 4th Street, Suite 8000
Santa Ana, California 92701
Telephone: (714) 338-3592
Facsimile: (714) 338-3708
E-mail: Anthony.Brown@usdoj.gov
Gregory.Scally@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>MARK ALBERT RETTENMAIER,<br><br>Defendant. | No. SA CR 14-188-CJC<br><br><u>GOVERNMENT'S POST-HEARING OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS EVIDENCE BASED ON ILLEGAL SEARCH OF DEFENDANT'S COMPUTER BY PERSONNEL OF BEST BUY</u><br><br>Hearing Date: None<br>Hearing Time: None<br>Location: Courtroom of the Hon. Cormac J. Carnev |

Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorneys Michael Anthony Brown and Gregory S. Scally, hereby files its Post-Hearing Opposition to Defendant's Motion to Suppress Evidence Based on Illegal Search of Defendant's Computer by Personnel of Best Buy ("Opposition").

This Opposition is based upon the attached memorandum of points and authorities, the files and records in this case, the declarations submitted in support of the

government's opposition, the testimony and exhibits from the evidentiary hearing, and such further evidence and argument as the Court may permit.

Dated: March 20, 2017

Respectfully submitted,

SANDRA R. BROWN
Acting United States Attorney

LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division

DENNISE D. WILLETT
Assistant United States Attorney
Chief, Santa Ana Branch Office

/s/
MICHAEL ANTHONY BROWN
GREGORY S. SCALLY
Assistant United States Attorney

Attorneys for Plaintiff
UNITED STATES OF AMERICA

# TABLE OF CONTENTS

DESCRIPTION PAGE

TABLE OF AUTHORITIES ..... ii

MEMORANDUM OF POINTS AND AUTHORITIES ..... 1

I. INTRODUCTION ..... 1

II. STATEMENT OF FACTS ..... 4

A. Geek Squad City and the FBI ..... 4

1. Geek Squad City ..... 4

2. Geek Squad City policy, training, and practice ..... 4

3. Geek Squad City's relationship with the FBI ..... 6

B. Defendant's hard drive ..... 10

1. Initial submission and defendant's authorization for data recovery ..... 10

2. Westphal's repair ..... 11

3. Meade's review ..... 12

4. Riley's review ..... 13

5. Riley's re-review ..... 14

C. Search warrants ..... 15

III. ARGUMENT ..... 15

A. Legal Standard ..... 15

B. Geek Squad City was not an agent of the FBI (or a government entity) ..... 16

C. Justin Meade was not an agent of the FBI ..... 19

1. Meade intended to further Geek Squad City's ends, not assist law enforcement ..... 20

2. The government did not know of or acquiesce in Meade's viewing of the images ..... 22

D. Meade's Examination of the Hard Drive Was No More Invasive than Westphal's ..... 23

IV. CONCLUSION ..... 25

# TABLE OF AUTHORITIES


DESCRIPTION PAGE

**Federal Cases**

Camara v. Mun. Court of S.F., 387 U.S. 523 (1967) ... 2

Corngold v. United States, 367 F.2d 1 (9th Cir. 1966) ... 16

Fernandez v. California, 134 S. Ct. 1126 (2014) ... 2

Rann v. Atchison, 689 F.3d 832 (7th Cir. 2012) ... 24

Skinner v. Ry. Labor Executives' Ass'n, 489 U.S. 602 (1989) ... 16

United States v. Ackerman, 831 F.3d 1292 (10th Cir. 2016) ... 19, 20

United States v. Andrini, 685 F.2d 1094 (9th Cir. 1982) ... 15, 18

United States v. Barth, 26 F. Supp. 2d 929 (W.D. Tex. 1998) ... 16

United States v. Grimes, 244 F.3d 375 (5th Cir. 2001) ... 16

United States v. Gumerlock, 590 F.2d 794 (9th Cir. 1979) ... 15

United States v. Hall, 142 F.3d 988 (7th Cir. 1998) ... 16

United States v. Jacobsen, 466 U.S. 109 (1984) ... 15, 23, 24

United States v. Johnson, 806 F.3d 1323 (11th Cir. 2015) ... 24

United States v. Lichtenberger, 786 F.3d 478 (6th Cir. 2015) ... 24

# TABLE OF AUTHORITIES

DESCRIPTION PAGE

**Federal Cases**

United States v. Meister,
596 F. App'x 790 (11th Cir. 2015) .......... 16

United States v. Peterson,
294 F. Supp. 2d 797 (D.S.C. 2003) .......... 16

United States v. Reed,
15 F.3d 928 (9th Cir. 1994) .......... passim

United States v. Runyan,
275 F.3d 449 (5th Cir. 2001) .......... 24

United States v. Tosti,
733 F.3d 816 (9th Cir. 2013) .......... 16

United States v. Walther,
652 F.2d 788 (9th Cir. 1981) .......... 23

**Federal Statutes**

42 U.S.C. § 16961(a)(1) .......... 19

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I. INTRODUCTION

Suppose you're in the business of data recovery. Suppose further that you have a very high-volume business, and on some small percentage of the computers that your customers submit for data recovery, technicians you employ stumble across disturbing images of children being sexually abused or depicted in sexual and humiliating positions.

What do you do? Order your technician to continue, asking her to look at the images to the extent necessary to complete the repair—traumatizing the technician and further exposing the victim's horror—and once completed with the repair, return the computer to its owner, turning the images loose into the world? Destroy the computer and subject yourself to liability for damaging a customer's property? Keep the computer and refuse to give it back to the customer, potentially coming into knowing and criminal possession of the images yourself?

Obviously, no. You call law enforcement. You tell every customer that any material containing these types of images will be turned over to law enforcement, and you go about your regular business of data recovery on computers. You don't go looking for these images – and you rigorously train your technicians only to look at parts of customers' computers necessary for the data recovery. But you tell your technicians that if they come across these types of images to stop and notify a supervisor, who will review the images and decide whether to call law enforcement. Law enforcement agents are then allowed to review the images themselves, and decide if they want to seize the computer.

Suppose, on the other hand, you're a Special Agent at an FBI field office that includes, within its area of responsibility, a gigantic data recovery facility for computers. And you get repeated calls from particular supervisors at that facility reporting devices that are suspected of containing images of children being sexually abused.

What do you do? Ignore the calls? Go to a magistrate and apply for a warrant to merely look at the computer, without any details that could provide the magistrate with a

basis to determine whether there's probable cause to believe there's anything at all on the computer? Force the supervisor to look at the images and describe them in detail to you so you can use the information to get a warrant?

No. You go look at the device—the portion shown to you by the supervisor who's made the determination to call you. And if there is child pornography on the computer, you seize it, and go to a neutral and detached magistrate for authorization to search further. And when, over time, due to the volume of the facility and the proliferation of child pornography enabled by the Internet, you find yourself fielding continual calls from the facility supervisor, you do your best to tell your own supervisors what's happening. You do this by attempting to document your contacts with the facility supervisor, and you do a background check on him to make sure you're not dealing with a criminal. Because he is a source of information and new cases, and this is the way the FBI tracks sources, you call him a "source."

The Fourth Amendment is offended by none of this. "The basic purpose of this Amendment, as recognized in countless decisions of [the United States Supreme] Court, is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials." *Camara v. Municipal Court of City and County of San Francisco*, 387 U.S. 523, 528 (1967). "The ultimate touchstone of the Fourth Amendment is reasonableness." *Fernandez v. California*, 134 S.Ct. 1126, 1132 (2014).

Nothing unreasonable occurred here, and there was no arbitrary invasion of anyone's privacy by governmental officials. Instead, Best Buy's Brooks, Kentucky repair facility ("Geek Squad City"), took reasonable steps to deal with a problem that arose solely in the regular course of business—and, as is clear from both sworn declarations and testimony—there's not a shred of evidence that anyone at Geek Squad City searched client computers at the behest of the FBI. And the FBI took reasonable steps to respond to communications from Geek Squad City—and there's not a shred of evidence that anyone at the FBI directed anyone at Geek Squad City to detect and locate child pornography for the purpose of reporting it to the FBI.

And the trail of documents left from the wholly understandable and natural relationship that grew between the FBI in Louisville and Geek Squad City—namely, repeated communications between the FBI and Justin Meade; contemplated (and rejected) training of Geek Squad City technicians to minimize "false positive" reporting of child pornography; a description of the relationship as a "close liaison;" an e-mail about nascent and nebulous consideration of additional collaboration (ultimately rejected)—don't change the fact that Geek Squad City employees never acted as agents of the FBI, and the FBI didn't ask them to.

It is true that a few payments to Geek Squad City supervisors by the FBI unnecessarily muddied the waters here. But however ill-advised those payments may have been, one thing is clear from the testimony of the people who received them: the money, more of an embarrassment than an incentive, did nothing to turn Geek Squad City supervisors into government agents or Geek Squad City itself into a secret FBI surveillance machine.

Defendant's motion asks the Court to see the conscientious efforts of Geek Squad City employees to report possible child pornography crimes to the FBI, and the FBI's good faith efforts to deal with the legal and logistical difficulties of investigating child pornography inadvertently discovered by private parties, as a vast conspiracy by Geek Squad City and the federal government to violate defendant's Fourth Amendment rights—indeed, the right to privacy of anyone who has ever had data recovery services performed at Geek Squad City. To adopt this distorted view of the facts, however, the Court would have to reject the credible and corroborated testimony of all the government's witnesses—both current and former Geek Squad City employees and FBI agents, some with no direct involvement in defendant's case at all—in favor of defendant's tendentious readings of stray comments from a few cherry-picked documents. The Court should reject defendant's baseless, implausible conspiracy theory and deny defendant's motion to suppress.

## II. STATEMENT OF FACTS

### A. Geek Squad City and the FBI

#### 1. Geek Squad City

Best Buy maintains a facility in Brooks, Kentucky known as "Geek Squad City," where computers submitted by customers for repair are commonly sent when the local store cannot fix the computer. (Riley ¶ 8; Williams ¶ 4.)[1] It is an extremely high-volume facility, handling approximately 2,000 data recovery service orders at a time. (1/12/17 RT1 129-30.) Geek Squad City is within the area of responsibility of the Louisville Field Office of the FBI. (Riley ¶ 8.) The service order for every computer submitted to Geek Squad City is signed by the customer, and contains the following notice: "I am on notice that any product containing child pornography will be turned over to the authorities." (DX 124.)

#### 2. Geek Squad City policy, training, and practice

Best Buy policy prohibits technicians from looking at any files on clients' computers other than what is required by the service order for the computer's repair. (Ratliff ¶ 4, Westphal ¶ 5, Christophel ¶ 3; 1/12/17, RT1 141; Williams ¶ 3; *see also* Mot. Ex. 3.) The policy is spelled out in the Geek Squad Agent Pledge to Protect. (Mot. Ex. 3.) Supervisors at Geek Squad City directed technicians performing repairs to follow this policy. (Ratliff ¶ 6; Meade ¶ 6; Christophel ¶ 5; Hans ¶ 5; Taylor ¶ 7; Westphal ¶ 5-6.) Technicians were told by supervisors not to search for child pornography or any other files on customers' computers beyond what was required by the service order, but to report inappropriate content to a supervisor if they saw it in the course of repair. (Taylor ¶ 7; Westphal ¶ 5; 1/12/17 RT1 108, 131; *see also* Mot. Ex. 3.)

---

[1] Declarations are referred to by the declarant's last name followed by the paragraph number. "Mot." refers to defendant's original motion (ECF 80), "Opp." to the government's opposition (ECF 96), and "PHB" to defendant's post-hearing brief (ECF 210). "DX" refers to a defense exhibit admitted during the evidentiary hearing on defendant's motion. "RT" refers to the reporter's transcripts of the January 11-12, 2017, evidentiary hearing on defendant's suppression motions, concurrently lodged with this post-hearing brief; all such references are to the date, volume, and page number.

Best Buy policy specifies that Geek Squad technicians are not to show the content of the images to other employees, and shut off the computer and report it to a supervisor. (Mot. Ex. 3.)

As part of the repair process carried out by Geek Squad City, pictures and videos sometimes come up on the screen of the computer when the technician carries out the repair.[2] (Ratliff ¶ 3; 1/12/17 RT1 145-46; see also Meade ¶¶ 12-13.) Supervisors at Geek Squad City were notified by technicians when technicians came across suspected child pornography on customers' devices they were repairing. (Hans ¶¶ 3-4; Rodgers ¶ 3; Ratliff ¶ 3; Meade ¶ 4.) Geek Squad City policy for this situation is for the technician to stop working and notify a supervisor, and for the supervisor to decide whether to call law enforcement. (Ratliff ¶ 3; Rodgers ¶ 3.)

When a technician saw images of child pornography, the technician would turn the screen off, inform a supervisor, and tell the supervisor, generally right at that moment, how the technician came across the images. (1/12/17 RT1 111.) The technician would write out a description of how he or she had discovered the images. (*Id.* at 112.) The supervisor would then use that description to find the images the technician saw, in an environment away from other employees. (*Id.* at 111, 124-26.) The supervisor would possibly have to scroll down in a screen of images to locate the images the technician saw. (*Id.* at 131, 133.) The supervisor would attempt to recreate the process used by the original technician, and duplicate the exact same search, using the exact same tool the technician used. (*Id.* at 148-49.) The supervisor would make a determination whether to call the FBI about images on the computer. (Meade ¶ 4.)

---

[2] Geek Squad City technicians typically work on a "mule"—an imaged copy of the hard drive submitted for repair. (1/12/17 RT1 115-16.) This was done so that the original hard drive could remain intact, while the data recovery process could be undertaken on a drive that would not affect the original drive should additional failures be caused during the repair process. (Id. at 114-116.) The information on the mule was generally kept until after the recovery was completed. (Id. at 121.)

3. Geek Squad City's relationship with the FBI

If they determined the images warranted reporting, Geek Squad City supervisors reached out to the FBI's local division in Louisville, Kentucky, to notify them of the situation. (Hans ¶¶ 3-4; Rodgers ¶ 3; Ratliff ¶ 3; Meade ¶ 3.) Technicians had no contact with the FBI. (Ratliff ¶ 5.) Geek Squad City supervisors reached out to the FBI, not the other way around. (1/12/17 RT2 32-33; Hans ¶ 3; Christophel ¶ 6.) In 2007 and 2008, the supervisors reached Special Agent Richard Boswell, an agent specializing in violent crime at the Louisville FBI office at the time. (Boswell ¶ 2; Hans ¶ 3.) SA Boswell responded to Geek Squad City on a number of occasions during 2007 and 2008 regarding suspected child pornography that had been found by a Geek Squad City technician in the course of carrying out a service order. (Boswell ¶ 3.) The standard conversation SA Boswell had with every individual he had contact with at Geek Squad City was to direct the person not to do anything above and beyond what they would normally do as a Best Buy employee. (Boswell ¶ 4.)

SA Boswell was aware of four employees—Michael Hans, Michael Rodgers, Randall Ratliff, and Justin Meade—who contacted the FBI regarding child pornography found on customers' computers. (Boswell ¶ 5.) To best track the relationship the FBI had with these individuals and to document contacts the FBI had with them, the FBI classified these individuals as confidential human sources ("CHS's"), though they were simply employees at Geek Squad City who happened to be in a position to report child pornography that technicians had come across during the course of repairing computers. (Boswell ¶ 5; *see also* Riley ¶ 10; Meade ¶ 5; 1/12/17 RT2 33.) SA Boswell, in his role as point of contact for Geek Squad City about suspected child pornography, was subsequently replaced with SA Jennifer Cardwell, who was the main point of contact in 2009 and 2010, until SA Tracey Riley replaced her in that role. (1/12/17, RT2 6-7; Cardwell ¶ 3; DX 152.)

The FBI was never involved in the data recovery process. (1/12/17 RT1 155; 1/12/17, RT2 33-34.) The FBI did not direct Geek Squad City employees to look out for

particular customer's hard drives. (*Id.*) Instead, the role the agents played was limited to responding to calls from Geek Squad City supervisors to determine whether what the supervisor saw on their screen was child pornography, and to decide whether to seize the hard drive as a result. (1/11/17 RT2 71-72, 75.) When the agents arrived, the supervisor would either already have the screen they had bookmarked up on the monitor or would pull it up. (1/11/17, RT2 86; 1/12/17 RT1 124.) The supervisor might scroll through the screen, but not always. (1/12/17 RT 1 135-36; 1/11/17 RT2 87.)

No FBI agent ever asked, instructed, or directed any employee at Geek Squad City, including those designated as CHS's, to search for child pornography or evidence of any other crime on behalf of the FBI, at any time. (Boswell ¶ 5; Cardwell ¶ 4; Riley ¶¶ 9, 11; Ranieri ¶ 6; 1/12/17 RT3 72; *see also* Rodgers ¶ 4; Hans ¶ 5; Ratliff ¶ 6; Meade ¶ 6; Christophel ¶ 5; Taylor ¶ 8; Westphal ¶ 6; 1/12/17 RT1 153.) No employee at Geek Squad City, to include both supervisors and technicians, ever: (i) agreed to search for child pornography or any other evidence for the FBI, (ii) in fact searched for child pornography or any other evidence for the FBI, (iii) searched customers' computers beyond what was required by the customer's service order, or (iv) knew of anyone at Geek Squad City who searched for child pornography on behalf of the FBI. (Meade ¶¶ 6, 8; Christophel ¶¶ 4, 5; Hans ¶ 5; Ratliff ¶ 6; Taylor ¶ 8; Westphal ¶ 6; Rodgers ¶ 4.)

No supervisor who contacted the FBI was motivated by a desire to help law enforcement, be a vigilante, act as an agent of the FBI, or get paid by the FBI. (Ratliff ¶ 6; Meade ¶¶ 6, 7; Christophel ¶ 6; Hans ¶ 5; Rodgers ¶¶ 4, 5; 1/12/17 RT2 39-40.) Instead, the supervisors were merely carrying out Geek Squad City's policy to report possible child pornography to law enforcement. (Ratliff ¶ 6; Meade ¶ 6; Christophel ¶ 6; Hans ¶ 5; Rodgers ¶¶ 4,5.)

Between 2007 and 2012, Rodgers, Hans, Ratliff, and Meade were each paid by the FBI. Rodgers was paid $1000 once in 2007; Hans was paid $500 once in 2008; Ratliff was paid $500 on two occasions, once in 2008 and once in 2011; Meade was paid $500 on one occasion in 2011. (DX 203, 1801-02 [Rodgers]; DX 202, 1725-26 [Hans]; DX

182, 1154, 1156, 1158-59 [Ratliff]; DX 152, 39-40 [Meade].) When the supervisors received money from the FBI, they did not understand the payment as encouragement to find child pornography on behalf of the FBI, and were uncomfortable receiving money. (Hans ¶ 6; Ratliff ¶ 7; Rodgers ¶ 5; Boswell ¶ 6; 1/12/17, RT2 39-40.) Two of them gave the money to charity. (Hans ¶ 6; Ratliff ¶ 7.) Another tried to give it back. (Rodgers ¶ 5.) The fourth does not remember being paid. (Meade ¶ 7; 1/12/17 RT1 137-38, 153.) SA Boswell indicated that he paid them because he took up their time, and compensated them for it. (1/12/17 RT2 39.) SA Boswell was not trying to encourage them to act outside of the regular course of business to find child pornography on behalf of the FBI. (*Id.*) Rodgers left Geek Squad City in April or May 2007; Hans left in July 2008. (Rodgers ¶ 2; Hans ¶ 2.) Neither worked at Geek Squad City when child pornography was discovered on defendant's hard drive.

Supervisors at Geek Squad City were not actively searching for child pornography, or directing their subordinates to do so, both because it was against company policy and because they found the material disturbing. In particular, Meade, who does not typically consume alcohol, found that the days when he had to view images of child pornography were "some of our worst days at work," and "days [he] drank alcohol after [he] came home from work." (1/12/17 RT1 152-53.) Christophel, who worked with Meade, also found the material "extremely disturbing," and to his knowledge, everyone else at Geek Squad City who was subject to these circumstances felt the same way. (Christophel ¶ 4.) The culture of Geek Squad City involved no glory in finding child pornography—"quite the opposite." (1/12/17 RT1 154.) Geek Squad City did not reward technicians or supervisors in any way for finding child pornography on customers' computers. (*Id.*)

Meade also indicated he did not search out child pornography because it was "against policy" and it was "illegal and unethical." (*Id.* at 152-53.) Meade has a tattoo of the Geek Squad logo on his shoulder because, when he was 20 or 21 years old, his friends were getting tattoos that did not seem to mean anything to them, and, in a

conversation, Meade was challenged to identify what would mean something to him. (*Id.* at 143.) Meade responded, "Well, honestly the Geek Squad logo," because he "would always be proud of what that brand was founded for, why it was founded, what it does for the general public, what it does for the people that work there." (*Id.* at 143; *see also* DX 189, 1299.)

Searching a computer for child pornography would be contrary to policy, as well as unethical and immoral, in Meade's opinion. (*Id.* at 142.) In Meade's opinion, such conduct would also "tarnish the brand" of a company Meade has worked at since age sixteen, where he has been in leadership for thirteen years, and where he takes his duty seriously. (*Id.*) He has fired people for doing things that tarnish the brand. (*Id.*)

The CHS files and e-mail correspondence for the Geek Squad City supervisors contain the following information:

In the CHS file for Rodgers is a letter dated January 23, 2007, in which FBI Supervisory Special Agent Frank Dufon wrote, to an AUSA, "Under the direction and control of the FBI, the [cooperative witness] agreed to notify the FBI when [he] detects the presence of child pornography during the regular course of [his] employment and is willing to testify in a court of law." (DX 203, 22.) Rodgers said in his declaration that he was not encouraged to find child pornography on customers' computers for the FBI, and that no one at the FBI ever instructed him to do so. (Rodgers ¶¶ 4-5.) Defendant did not subpoena SSA Dufon to the hearing, and declined to cross-examine Rodgers.

On February 27, 2008, SA Brett Johnson wrote an internal e-mail to FBI headquarters "throw[ing] out the idea of obtaining some sort of training for the Geek Squad." (DX 227; 1/12/17 RT3 74.) The idea was rejected and no training of any sort of Geek Squad City employees by the FBI occurred. (1/12/17 RT3 74-75.) On May 30, 2008, SA Boswell wrote that Hans mentioned to him that Best Buy was in the process of writing a software program that would help them identify potential images of child pornography on their computer system. (DX 202, 10.) Geek Squad City was trying to identify potential images of child pornography that one of their own employees might

have on a work-issued computer, and not trying to identify child pornography on customers' computers. (1/12/17 RT2 35.) SA Boswell told Hans that Best Buy could look for images of child pornography "in the course of their normal business," and that the "government was not allowed to direct the company to look for the images." (*Id.*)

On September 9, 2008, SA Johnson arranged a meeting of a Cyber law enforcement group at the Geek Squad City facility, at which attendance was very sparse – probably three people including SA Johnson. (1/12/17 RT3 73.) Geek Squad City employees took them on a tour of the facility. (*Id.* at 73-74.) SA Johnson wrote in his report of the meeting that the FBI in Louisville had "maintained close liaison with the Geek Squad's management in an effort to glean case initiations." (DX 204.) SA Johnson's basis for saying this was his "understanding that [the FBI] had received a number of referrals from the Geek Squad and that they chose the FBI over other agencies to investigate their cases." (1/12/17 RT3 83.)

On October 29, 2009, SA Cardwell wrote an e-mail to Meade indicating she would "be bringing another agent with [her] to discuss some other ideas for collaboration." (DX 174 at 1018.) The agent was SA Joseph Ranieri, who had no concrete plans for using Meade in any particular way, or with regard to any particular investigation. (Ranieri ¶ 4.) Meade said he would help if he could, within the bounds of what would be permitted by Best Buy corporate policy. (Ranieri ¶ 5.) Nothing ever came of it. (Ranieri ¶¶ 4-5.) It left no impression on Meade. (1/12/17 RT1 151-52.)

**B. Defendant's hard drive**

1. <u>Initial submission and defendant's authorization for data recovery</u>

On November 1, 2011, defendant took his computer to a Best Buy location in Mission Viejo because it would "not boot." (DX 143, 144.) Defendant approved data recovery service for the hard drive. (DX 124; Meade ¶ 10.) His hard drive was shipped to Geek Squad City in Brooks, Kentucky. (Williams, Ex. A, 852.)

Geek Squad City technician Michael Taylor performed a diagnostic test on defendant's hard drive to identify the level of data recovery required to retrieve the data,

which would allow Geek Squad City to provide defendant with an estimate of how much it would cost to recover the data. (Taylor ¶ 4.) The process did not allow Taylor to see the contents of any files on defendant's computer. (Taylor ¶ 5.) Another Geek Squad City employee called defendant, provided an estimate for the recovery, and received defendant's authorization to perform data recovery. (DX 157 at 5.) Defendant specified photographs among the items he wanted recovered on his hard drive. (*Id.*)

2. Westphal's repair

On December 20, 2011, Trey Westphal, a data recovery technician at Geek Squad City, was sitting at his work station of six computers. (1/12/17 RT1 103.) Westphal, going through his daily duties of ensuring that data recoveries continued through their proper processes, found that defendant's hard drive was at the data review station and recovery had been completed. (*Id.* at 104.) Westphal worked on that hard drive because it was the next item that needed to be processed. (*Id.*) He did not discuss the hard drive with any supervisors prior to working on it. (*Id.*)

Westphal did not search defendant's hard drive for child pornography. (Westphal ¶ 4.) Westphal performed a data review to ensure that the data recovery had been successful, and would meet the client's needs. (1/12/17 RT1 105, 113.) Westphal was specifically looking for photographs as the client mission criticals—i.e., the information sought out or requested by the client to be recovered. (*Id.* at 107; Westphal ¶ 3(c).) While conducting the review to determine what level of corruption there was, Westphal pulled up a screen of approximately twenty large thumbnail photographs. (*Id.* at 108.) Westphal, while glancing through and determining which images were corrupt, saw images that he thought were inappropriate and needed to be reported to a supervisor. (*Id.* at 102, 109.) Though Westphal said he would typically stop upon seeing one image, Westphal saw multiple inappropriate images on defendant's computer. (Westphal ¶ 3, Ex. A [noting he came across "some" images that appeared inappropriate]; 1/12/17 RT1 109 ["I saw images that were questionable."]) Westphal's process was the "textbook process" required by the service order for defendant's hard drive. (Meade ¶ 13.)

Westphal reported the inappropriate content to his supervisor, Meade, who requested a statement of how Westphal ran across the images. (Id., 101, 102, 109, 111.) Westphal turned the screen off, and Meade pulled the hard drive for review elsewhere. (*Id.* at 111; *see also* 1/12/17 RT1 147-48.) Westphal wrote out the process he performed in detail so that Meade could use it to re-create the process. (1/12/17 RT1 112; Westphal Ex. A.)

Westphal's intent in reporting the images to Meade was to comply with Geek Squad City policy. (Westphal ¶ 6.) Westphal was not an FBI source, and was never paid by the FBI. (Westphal ¶ 7.) He knew that looking at files on a customer's device beyond what was required to carry out the service order could lead to his termination. (Westphal ¶ 5.) Meade directed him to follow the policies of Best Buy. (*Id.*)

3. Meade's review

Meade does not specifically remember defendant's hard drive. (1/12/17 RT1 124.) However, based on his normal practice, Meade testified that when an employee discovered child pornography, he would ask them to detail for him "what they were doing and what part of their work they were engaged so that [he] could recreate that same behavior to make sure [they] were actually looking at the same thing." (*Id.* at 125.) He would "recreate that search again to make sure that we weren't crying foul or, you know, crying wolf." (*Id.*) Meade wanted to make sure he was actually "seeing the same thing" as the technician "before [he] made that phone call or sent that e-mail in" to the FBI. (*Id.*) He would "just reproduce the same search that the [technician] did and make those available, the same thing that we saw," to the FBI. (*Id.* at 125-26; *see also* 148-49.)

Meade also testified that he could not separate out specific images, but could only recreate the process that the technician had engaged in, which could potentially bring up images that extended more than one screen. (*See id.* at 126.) As a result, he might have to scroll down to get to the images that concerned the technician, especially if there were a lot of files brought up by the process the technician had used. (*Id.* at 126, 133.) The images originally seen by the technician that the technician found troubling "may have

been on the [initial] screen or during the rest of his process to determine whether or not the files were viable." (*Id.* at 133.) The technician, in accordance with Best Buy policy, would stop as soon as he saw something that made him uncomfortable, and Meade would recreate the process, attempt to view the same images, and see if there were images that warranted calling law enforcement. (*Id.* at 133.) Meade's role was to "reduplicate" the technician's efforts and make the final decision about whether to report the images to law enforcement. (*Id.* at 148.)

Meade's review was about trying to find what the technician found. (1/12/17 RT1 151.) He was not trying to find something new for the FBI; he was not trying to look beyond the original search by the technician; he was not trying to find additional images that could help make a case at the FBI; he was not trying to make a case for the FBI; he was never motivated by trying to help the FBI find child pornography. (*Id.* at 151.) Indeed, Meade never reviewed evidence or communicated to the FBI out of a motivation to get paid by the FBI or any other law enforcement agency. (Meade ¶ 7.) His intent in reviewing hard drives in any given case was to carry out his duty as an employee of Geek Squad City, and he was motivated by his duty to act in accordance with Geek Squad City policy. (Meade ¶ 6.) Meade was not motivated by an independent desire to assist law enforcement. (*Id.*)

4. <u>Riley's review</u>

On January 5, 2012, Meade wrote SA Riley an e-mail, saying, "We have another one out of California we want you to take a look at, when can you swing by?" (DX 117.) This was the first SA Riley had heard of this particular hard drive or any search of it being performed at Geek Squad City. (Riley ¶ 2.) SA Riley responded to the Best Buy on January 6, 2012, and was shown images displayed for her on a computer at Best Buy. (Riley ¶ 3.) SA Riley was not able to and did not scroll down through any images on defendant's hard drive, a fact corroborated by her nearly contemporaneous report of the matter in her e-mail to Kayle on January 27, 2012. (Riley ¶ 3; 1/11/17 RT2 85-87; *see also* GX 3; 1/12/17 RT1 150.) ) SA Riley did not go through any folders or areas of

the hard drive beyond what was already up on the computer screen as presented to her. (Riley ¶ 3.) SA Riley observed multiple images of child pornography and seized the hard drive. (Riley ¶¶ 3-5; DX 114.)

5. Riley's re-review

SA Riley was aware that Best Buy worked on mules, and thus had a copy of the hard drive she seized, though that was not at her direction. (1/11/17 RT2 47-49.) Through communication with SA Cynthia Kayle, who was seeking a warrant on defendant's house based on SA Riley's observations of child pornography on defendant's hard drive, SA Riley came to believe that the AUSA working with SA Kayle wanted more detailed descriptions of the images SA Riley had originally viewed on defendant's hard drive. (*Id.* at 54-55.) On February 2, 2012, SA Riley sent an e-mail to Meade, cc-ing Ratliff and Christophel, stating, "Guys, I need to come back to your shop this Friday to re-review (sorry AUSAs in other parts of the country want more) the hard drives for the two captioned people." (DX 162, 1039.) Meade or another supervisor arranged for Riley to see images on defendant's hard drive again. (1/12/17 RT1 130-31.)

SA Riley does not specifically remember returning to Geek Squad City on February 3, 2012, but believes she did based on contemporaneous correspondence and documents. (1/11/17 RT2 50.) SA Riley did not ask to look at, or in fact look at, any images she had not seen the first time she reviewed defendant's hard drive. (*Id.* at 55, 57, 76-77.) The Geek Squad City employee who gave her access to the images recreated the methodology done from the previous search to do their best to recreate the same search again. (1/12/17 RT1 131.) SA Riley went back one time only to re-review images in this fashion. (*Id.* at 51.) She went back only because she was under the (mistaken) impression that the AUSA working with SA Kayle wanted her to go back and obtain more detailed descriptions of what she had originally seen. (*Id.* at 54-55.) SA Riley did not demand copies of the mules because she did not interfere with Best Buy's business practices. (*Id.* at 48-49.) There is no evidence that Geek Squad City was

specifically allowed to retain the mules for the purpose of helping the FBI. (*See* PHB, 9.)

**C. Search warrants**

Based on SA Riley's observations of child pornography on defendant's hard drive on January 6, 2012, SA Kayle submitted affidavits in support of search warrants to further search the hard drive and to search defendant's residence. The images specifically noted by SA Riley at her re-review on February 3, 2012, were not included in the affidavits. The search warrant was executed on the hard drive and at defendant's home, where law enforcement agents recovered devices belonging to defendant containing thousands of images of child pornography. The evidence found on the hard drive and at the home forms the subject of defendant's motion to suppress.

**III. ARGUMENT**

**A. Legal Standard**

"The well-established rule is that the [F]ourth [A]mendment applies to a private party's actions only if, in light of all the circumstances, the party must be regarded as an instrument or agent of the state." *United States v. Andrini*, 685 F.2d 1094, 1097 (9th Cir. 1982); *see also United States v. Reed*, 15 F.3d 928, 930-31 (9th Cir. 1994) ("[T]he Fourth Amendment generally does not protect against unreasonable intrusions by private individuals."). Once an individual's expectation of privacy in particular information has been frustrated by a private individual, the Fourth Amendment does not prohibit law enforcement's subsequent use of that information, even if obtained without a warrant. *United States v. Jacobsen*, 466 U.S. 109, 116 (1984). As a result, a warrantless law-enforcement search conducted after a private search violates the Fourth Amendment only to the extent to which it is broader than the scope of the previously occurring private search. *Id.* at 115.

"The defendant has the burden of showing government action." *Reed*, 15 F.3d at 931 (citing *United States v. Gumerlock*, 590 F.2d 794 (9th Cir. 1979) (*en banc*)). In determining whether a private party's search implicates the Fourth Amendment, the

Court considers: "(1) whether the government knew of and acquiesced in the intrusive conduct; and (2) whether the party performing the search intended to assist law enforcement efforts or further his own ends." *Id.* "Whether a private party should be deemed an agent or instrument of the Government for Fourth Amendment purposes necessarily turns on the degree of the Government's participation in the private party's activities, a question that can only be resolved in light of all the circumstances." *Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602 (1989).

**B. Geek Squad City was not an agent of the FBI (or a government entity)**

Computer repair technicians who find child pornography in the course of repairing a computer are not government agents. *See, e.g., United States v. Tosti*, 733 F.3d 816, 821-22 (9th Cir. 2013); *United States v. Grimes*, 244 F.3d 375, 383 (5th Cir. 2001); *United States v. Hall*, 142 F.3d 988, 993 (7th Cir. 1998); *United States v. Peterson*, 294 F.Supp.2d 797, 804-05 (D.S.C. 2003); *United States v. Barth*, 26 F.Supp.2d 929, 935-36 (W.D. Tex. 1998); *United States v. Meister*, 596 Fed. Appx. 790, 792-93 (11th Cir. 2015).

Geek Squad City is no exception. Geek Squad City technicians, engaged in the repair of computers pursuant to service orders specifying the repair needed, would discover contraband during the process of repair, and a supervisor would notify law enforcement, who would then secure a warrant on the basis of the information. This procedure was specifically blessed by the Supreme Court in 1966. Where "a carrier, while inspecting packages for its own purposes pursuant to a provision in the contract of carriage, discovers contraband and notifies the customs agents of that fact, and the agents then secure a warrant on the basis of this information and conduct a search, the search [is] entirely proper. This is precisely the procedure which the Fourth Amendment contemplates." *Corngold v. United States*, 367 F.2d 1, 6 (1966).

Geek Squad City's policies, training, and procedures reveal a company merely responding to the unwelcome situation of finding child pornography on customer computers—i.e., a private party furthering its own ends, not intending to assist law

enforcement efforts. *Reed*, 15 F.3d at 931. The culture of Geek Squad City involved no glory in finding child pornography—"quite the opposite." (1/12/17 RT1 154.) Technicians were trained not to go looking for anything on customers' computers beyond what was necessary to carry out the repair, but to stop and notify a supervisor if they saw child pornography. (Taylor ¶ 7; Westphal ¶ 5; 1/12/17 RT1 108, 131; *see also* Mot. Ex. 3.) Supervisors who had to look at the material to carry out the policy of determining whether the notify the FBI found the material "extremely disturbing," or had to drink after work to cope with the trauma of seeing the material. (Christophel ¶ 4; 1/12/17 RT1 152-53.) The supervisors were information technology specialists not remotely interested or motivated to engage in the "police function"—not a single one was motivated by a desire to help law enforcement or get paid by the FBI. Instead, they were merely carrying out the company policy and following routine procedure. (Ratliff ¶ 6; Meade ¶ 6; Christophel ¶ 6; Hans ¶ 5; Rodgers ¶¶ 4,5.)

The relationship that grew between Geek Squad City and the FBI did not convert Geek Squad City into a government agent for the purposes of every search by any technician, such as Westphal, as defendant contends. First, technicians had no contact with the FBI. (Ratliff ¶ 5.) Second, the repair processes undertaken by technicians such as Westphal simply did not involve FBI participation in any way. (1/12/17 RT1 155; 1/12/17, RT2 33-34.) Third, the uncontroverted evidence is that technicians never searched computers for child pornography, either on their own or under the direction of any supervisors, let alone the FBI. (Meade ¶¶ 6, 8; Christophel ¶¶ 4, 5; Hans ¶ 5; Ratliff ¶ 6; Taylor ¶ 8; Westphal ¶ 6; Rodgers ¶ 4.) To the contrary, the technicians were instructed to follow the policy of not searching computers beyond what was required for the service order. (Ratliff ¶ 6; Meade ¶ 6; Christophel ¶ 5; Hans ¶ 5; Taylor ¶ 7; Westphal ¶ 5-6.)

Moreover, the FBI did nothing to change this. In particular, the FBI was not at all involved in the data recovery process of a routine hard drive at Geek Squad City. (1/12/17 RT1 155; 1/12/17, RT2 33-34.) The FBI never directed Geek Squad City

employees to look out for particular customers' hard drives. (*Id.*) The FBI cannot be said to have "known of and acquiesced" in Geek Squad City carrying out its typical repairs, because the FBI simply had nothing to do with this process. *See Reed*, 15 F.3d at 931.

Furthermore, the FBI's contacts with Geek Squad City supervisors did not change the processes of the technicians in any way. Indeed, SA Boswell instructed every individual he had contact with at Geek Squad City not to do anything above or beyond what they would ordinarily do as a Geek Squad City employee. (Boswell ¶ 4.) *Cf. Andrini*, 685 F.2d at 1098 (where officer instructed private party "to follow routine motel procedure," private party's opening of bag pursuant to routine procedure not governed by Fourth Amendment). No agent of the FBI ever directed anyone at Geek Squad City to do anything outside the scope of their employment, much less directed anyone at Geek Squad City to search for child pornography on behalf of the FBI. (Boswell ¶ 5; Cardwell ¶ 4; Riley ¶¶ 9, 11; Ranieri ¶ 6; 1/12/17 RT3 72; *see also* Rodgers ¶ 4; Hans ¶ 5; Ratliff ¶ 6; Meade ¶ 6; Christophel ¶ 5; Taylor ¶ 8; Westphal ¶ 6; 1/12/17 RT1 153.)

The isolated and minimal payments to Geek Squad City supervisors had no effect, let alone one that transformed the entire enterprise into an agent of the government. Indeed, if there was any effect, it was actually to alienate the supervisors from the FBI. Supervisors were almost uniformly disconcerted and embarrassed about receiving money from the FBI, and have all specifically testified that they did not do anything during their employment with Geek Squad City out of a motive to get paid by the FBI, let alone violate company policy, direct others to do so, or search for material that was extremely disturbing. (Ratliff ¶ 6; Meade ¶¶ 6, 7; Christophel ¶ 6; Hans ¶ 5; Rodgers ¶¶ 4, 5; 1/12/17 RT2 39-40.) This evidence remains uncontroverted.

Defendant's scattershot misinterpretations of documents from the CHS files and e-mail correspondence should not persuade the Court otherwise. There was no training of Geek Squad City employees by the FBI, despite an e-mail broaching the idea. (DX 227; 1/12/17 RT3 74-75.) Best Buy was not developing a system to find child pornography

on customers' computers, let alone one that the FBI was involved with. It was considering software that would identify child pornography on its own computers used by its own employees. (1/12/17 RT2 35; DX 202, 10.) There was no sinister "collaboration" with SA Cardwell—SA Ranieri's testimony proves it. (Ranieri ¶¶ 4-5; 1/12/17 RT1 151-52.) Geek Squad City's contacting the FBI to investigate the cases, instead of other law enforcement agencies, was dictated by jurisdictional considerations, not by some devious plot. (*See* Hans ¶ 3; Mot. Ex. 3 at 24.) The characterization of the relationship between the Louisville Field Office and Geek Squad City management as a "close liaison" by SA Johnson, a supervisory agent who had no direct dealings with Meade or Ratliff, was based merely on the fact that the FBI had "received a number of referrals" from Geek Squad City (1/12/17 RT3 82), and does not support defendant's theory of a "joint venture to ferret out child porn" between the FBI and Geek Squad City. (PHB, 4.)

Geek Squad City was not an agent of the government, much less a "government entity" carrying out the public, political, and sovereign function of "policing." In support of his argument to the contrary, defendant cites only *United States v. Ackerman*, 831 F.3d 1292 (10th Cir. 2016), a case about an entity—the National Center for Missing and Exploited Children, or "NCMEC"—statutorily created and specifically obliged "to assist or support law enforcement agencies in administration of criminal justice functions." *Ackerman*, 831 F.3d at 1297 (citing 42 U.S.C. § 16961(a)(1)). Geek Squad City plays no such role, let alone one proscribed by statute. Defendant's claim that "all hard drives submitted to Best Buy ... were probably searched for child porn at Geek Squad City" is wholly unsupported by the evidence, and directly and specifically contradicted by the sworn testimony of Hans, Rodgers, Ratliff, Meade, Christophel, Westphal, Taylor, and Williams.

**C. Justin Meade was not an agent of the FBI**

Meade was also not an agent of the FBI, and his viewing of images on defendant's hard drive was not a government search.

1. <u>Meade intended to further Geek Squad City's ends, not assist law enforcement</u>

Meade testified that he intended to further Geek Squad City's ends rather than to assist law enforcement in reviewing hard drives and reporting child pornography to the FBI. (Meade ¶¶ 6-7.) This testimony should be credited for a number of reasons.

First, Meade is a deeply committed employee of Geek Squad, whose commitment to furthering Geek Squad City's ends would be difficult to question. Meade has been with the company since he was sixteen years old, has been in leadership for thirteen years, and takes a lot of pride in the brand and the environment that it provides to both customers and employees. (1/12/17 RT1 142.) He has one tattoo: the Geek Squad logo. (*Id.* at 142-43.)

Second, Meade's commitment to Geek Squad extends to Geek Squad City's policies to protect the privacy of their customers. When asked why he would not search a client's computer to find child pornography, Meade did not respond, simply, "Because it would be against policy." Instead, Meade elaborated, saying that, in addition to being against policy, such conduct would be "unethical and immoral in [his] opinion." (1/12/17 RT1 142, 152.) These were not answers derived from leading questions—they were the fulsome, heartfelt expressions of truth from the mind of a deeply committed employee.

Third, Meade testified credibly about how seeing images affected him. He did not direct technicians to go searching for child pornography not only because it was "against policy ... illegal and unethical," but also because, "quite frankly, some of these days that we had to deal with these situations were some of our worst days at work." (*Id.*) Not a drinker, he found that those would be the days he would drink alcohol after work. (*Id.*) For anyone who has been forced to view child pornography as part of their work, this rings true. And someone who feels this way does not go seeking this material out on behalf of law enforcement, but merely follows company policy in reporting it when necessary.

Fourth, Meade's testimony regarding his approach to finding child pornography is corroborated by the Geek Squad Pledge to Protect, which lays out the policy just as Meade and numerous other Geek Squad City employees describe it. (*See* Mot. Ex. 3.) Meade's testimony is also corroborated by employees both above and below him. Christophel and Ratliff were unaware of Meade instructing anyone at Best Buy to search for evidence on behalf of the FBI, and Christophel knew his colleagues—presumably, to include Meade—found the material disturbing. (Christophel ¶¶ 4-5; Ratliff ¶ 6.) Taylor, supervised by Meade, said he was instructed at employee meetings not to search for child pornography. (Taylor ¶ 7.) Westphal, supervised by Meade at the time defendant's hard drive was at Geek Squad City, said Meade directed him to follow the policies and procedures of Best Buy, in particular with regard to protecting customers' privacy. (Westphal ¶ 5.)

Fifth, the circumstances of the viewing show that it was designed to further Geek Squad's policies, not to help the FBI. Meade testified consistently that the purpose of his review was to make sure he had the right hard drive and to make a final determination as to whether to call law enforcement. (1/12/17 RT1 125, 133, 144, 148, 151.)

That Meade does not remember being paid as an informant (1/12/17 RT1 138) does not undermine his credibility, as defendant argues. (PHB 10-11.) His failure to recall is consistent with his understanding of his relationship with the FBI. Meade never saw himself as an FBI "informant," only as Geek Squad City's liaison to the FBI for reporting the inadvertent discovery of child pornography by Geek Squad City technicians—which is what he was. (Meade ¶¶ 5, 14; 1/12/17 RT1 138.) Indeed, when during cross-examination defense counsel suggested that Meade had used data recovery software with FBI agents at Geek Squad City, Meade's obvious confusion spoke volumes: "I don't ever recall. We wouldn't have—the work's already been done. Why would we ever do that? No." (1/12/17 RT1 130.) Meade's consistency about this demonstrates his honesty. From his first interview with the government through his filed

declaration to his cross-examination by defense counsel during the evidentiary hearing, Meade has maintained that he does not remember being paid. Even when confronted with the fact that FBI records seemed to show he was paid, Meade, as the Court will recall, did not appear agitated, change his story, or become evasive. He simply said that he did not remember that happening. (1/12/17 RT1 138.) The idea that Meade lied about being paid $500 over five years ago to avoid the stigma of being an informant (PHB 11) is far less plausible than that he simply forgot. Defendant argues that he must have known what "Burghley" was, though there is no evidence that this code name was provided by Meade, as opposed to coming from the agent. (DX 152, 1.) Meade's CHS file in two locations contains the "Date Drafted"—a reference to the date the document was drafted. (DX 189, 1216, DX 152, 929.) Defendant willfully misinterprets the documents in an effort to transform the word "drafted" to mean "recruited"—a piece of speculation wholly unsupported by any evidence.

The Court should credit Meade's testimony, and find that he acted in this case with the intent of complying with Geek Squad City's policies of reporting possible child pornography, not as an agent of the FBI investigating child pornography crimes.

2. <u>The government did not know of or acquiesce in Meade's viewing of the images</u>

Meade's viewing of the images after Westphal predated any FBI involvement with defendant's hard drive. Westphal discovered the child pornography on defendant's hard drive on December 20, 2011. (Westphal ¶ 3, Ex. A.) Meade first notified SA Riley about it on January 5, 2012. (DX 117.) That was the first SA Riley had ever heard about defendant or his hard drive. (Riley ¶ 2.) There is no evidence that the FBI had defendant under investigation or even knew that data recovery services were being performed on his hard drive before Meade's January 5, 2012, e-mail.

Therefore, even if Meade had to scroll down to get to the images that concerned Westphal, this does not convert Meade's search into a government search. First, no one at the FBI authorized Meade to engage in this type of review, or even communicated

with him about this type of viewing, ever. Accordingly, there was nothing for the FBI to "acquiesce in" because they were simply unaware that Meade was doing his review prior to contacting the FBI.

*United States v. Walther*, 652 F.2d 788 (9th Cir. 1981), is distinguishable and does not control the outcome here. (*See* Opp. 16-17.) The key differences are that (i) Meade was, unlike Rivard, carrying out a written and widely understood and implemented policy of Best Buy's—to report child pornography to law enforcement—which was a legitimate business reason for viewing the images; and (ii) Meade was not expecting payment for his reporting, unlike Rivard, who had been paid at least eleven other times.

**D. Meade's Examination of the Hard Drive Was No More Invasive than Westphal's**

Meade's search did not exceed the scope of Westphal's search. The government submits that the proper unit of measurement for evaluating the scope of the private search here is the data obtained by the process undertaken by the technician during the regular course of repair, including the portions thereby accessible only by scrolling down. As Meade testified, the images that concerned Westphal may have been accessible only by scrolling down, and Meade's purpose was to see the same images and confirm there was something worth reporting.

The Supreme Court has specifically found that this type of repeat viewing—involving minor or no expansion, dictated by logistical realities, and designed to ensure that the facts are reported correctly—does not run afoul of the Fourth Amendment. In *Jacobsen*, after FedEx employees opened a damaged package and observed white powder in a tube inside newspaper inside the package, they notified the Drug Enforcement Administration ("DEA"). *Jacobsen*, 466 U.S. at 111. Before the DEA agents arrived, they put the tube back in the newspaper and put the newspapers back in the box. *Id.* The DEA agent, upon arrival, reopened the package by removing the newspaper and opening the tube. *Id.* The Supreme Court found that the agent's actions "enabled the agent to learn nothing that had not previously been learned during the

private search." *Id.* at 120. "It hardly infringed respondents' privacy for the agents to reexamine the contents of the open package by brushing aside a crumpled newspaper and picking up the tube." *Id.* at 119. Here, even assuming Meade was a government agent for purposes of argument, it hardly infringed defendant's privacy for Meade to reexamine the images available to be viewed, through scrolling or not, on the screen that Westphal had gotten to through the normal course of business. And it does not infringe defendant's Fourth Amendment rights for Riley to review what Westphal and Meade had already seen. As in *Jacobsen*, the advantage gained by this activity "was merely avoiding the risk of a flaw in the employees' recollection, rather than in further infringing respondents' privacy." *Id.* "Protecting the risk of misdescription hardly enhances any legitimate privacy interest, and is not protected by the Fourth Amendment." *Jacobsen*, 466 U.S. at 119.

Indeed, Courts of Appeal have been grappling with the issue of identifying the right unit of measurement to describe the private search of a digital device. *See United States v. Runyan*, 275 F.3d 449, 464-65 (5th Cir. 2001) (police officers did not exceed scope of private search by wife when officers, with respect to those disks that wife had examined, examined more files than wife had); *Rann v. Atchison*, 689 F.3d 832, 836-38 (7th Cir. 2012) ("even if the police more thoroughly searched the digital media devices than [the private parties] did and viewed images that [the private parties] had not viewed, per the holding in *Runyan*, the police search did not exceed or expand the scope of the initial private searches"). Here, the appropriate unit of measurement by which to evaluate the scope of the private search—the portion of the computer accessible by scrolling down after the technician's process was performed—is comfortably within the holdings of both *Runyan* and *Rann* and strikes a reasonable balance between the public's privacy interests and the government's equally compelling interests in investigating crimes that have been inadvertently discovered by private parties.

*United States v. Sparks*, 806 F.3d 1323 (11th Cir. 2015), and *United States v. Lichtenberger*, 786 F.3d 478 (6th Cir. 2015) do not control this case. In *Sparks*, it was

entirely clear that the police officer had viewed a video not originally viewed by the private party, whereas here, Meade did everything he could to view the images Westphal had seen, and there is no evidence that Meade's viewing in fact exceeded Westphal's. *Lichtenberger* involved the unique circumstances of a police officer directing a private party to open photographs at random, with no effort to ensure they were the same as the photos the private party had seen earlier. Here, by contrast, Meade did everything he could to restrict the photos accessed to those that Westphal had already seen. (1/12/17 RT1 125, 148-150, 151.)

More important, to the extent Meade's viewing may be said to have possibly exceeded Westphal's, it was only because the logistical realities of the situation so dictated. If they saw child pornography on a customers' hard drive, Geek Squad City technicians stopped work immediately and a supervisor removed the hard drive from the floor to a secure environment—a process clearly designed to spare trauma to the technicians and to prevent further exposure of the images to other technicians on the floor of data recovery. Geek Squad City supervisors did everything they could to ensure that no further invasion of the customer's privacy occurred, using the exact same tool the technician used, and returning to the exact place the technician encountered the images, through mimicking a written, detailed description of the process the technician had undertaken when he came across the images.

Accordingly, even if Meade were a government agent, his viewing of the images did not exceed Westphal's private search. SA Riley's viewing of the same images, then, did not exceed the private search and does not implicate the Fourth Amendment.

## IV. CONCLUSION

For the foregoing reasons, the government respectfully requests that this Court deny defendant's motion to suppress.